UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN LLOYD,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>FACEBOOK, INC., et al.,<br><br>　　　　Defendants. | Case No. 21-cv-10075-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTON TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Docket No. 18 |

## I.　OVERVIEW

Pro se plaintiff Susan Lloyd ("Plaintiff") brings this action against Defendants Facebook, Inc., Meta Platforms Inc., and Mark Zuckerberg (collectively "Defendants"), alleging various violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the Unruh Act, as well as for fraud, invasion of privacy, breach of contract, negligence, and negligent infliction of emotional distress. For the following reasons, the Court **GRANTS** Defendants' motion to dismiss.

## II.　FACTUAL AND PROCEDURAL BACKGROUND

A.　Factual Background

Plaintiff alleges as follows in the First Amended Complaint ("FAC").

Plaintiff is a Pennsylvania resident with "severe vision issues" who has been disabled under the ADA since 2006. Docket No. 16 (FAC) ¶ 5. Lloyd uses the Facebook platform, an online social media and networking service owned by Meta. *Id.* ¶ 6. Meta is a multinational technology conglomerate and the parent organization of Facebook, Instagram, and other subsidiaries. *Id.* ¶ 7. Meta collects revenue through the Facebook platform by using third-party

advertisements. *Id.* ¶ 8. Mr. Zuckerberg is the Co-Founder and CEO of Meta and also serves as Meta's Chairman and Controlling Shareholder. *Id.*

### 1. The Facebook Platform

According to Plaintiff, the Facebook platform is not accessible to disabled individuals with no arms or problems with vision because of the following reasons:

(1) The font cannot be made larger,
(2) The platform cannot be viewed in both landscape and portrait orientations,
(3) The color combinations are not high contrast enough to be used by individuals with vision impairments,
(4) The text cannot be resized or readable when resized,
(5) The form fields do not have visible labels,
(6) Users are not made aware of missing, incorrect, or other errors entered into fields,
(7) Gifs and videos cannot be disabled to prevent seizures,
(8) Language tabs are not added,
(9) There is only an option to do dark mode or make the font smaller, and
(10) There is no accessibility statement.

*See id.* ¶ 10.

Plaintiff further claims that Defendants track users even when the user is logged off Facebook when she is on third party websites such as Chewy.com or Target.com, for which she never gave permission. *Id.* ¶¶ 30-31. According to Plaintiff, she is aware of this alleged tracking because advertisements from these sites immediately appear for her on Facebook after visiting them. *Id.* ¶¶ 30-32. Meta's relationship with the users – including Plaintiff – is governed by its Terms of Service (formerly known as Statement of Rights and Responsibilities), to which all users must agree to create a Facebook account.[1]

### 2. Third-Party Harassment

Plaintiff alleges that Defendants have allowed "over 500 people to harass and bully [Plaintiff] on Facebook, led by Joshua Thornsbery" since 2016. *Id.* ¶ 23. Thornsbery and his friends, many of whom are from motorcycle gangs including the Hells Angels, do not use their

---

[1] According to the Terms of Service, users impliedly agree to the Terms of Service by using the Facebook platform. *See* Heath Decl., Ex. A ("We hope that you will continue using our Products, but if you do not agree to our updated Terms and no longer want to be a part of the Facebook community, you can delete your account at any time.").

real names, create multiple accounts, share passwords and "have testified that they give. . . other people. . . [access to] their accounts." *Id.* For over five years, these individuals threatened to rape and murder Plaintiff by shooting her with a gun, choking her to death, and blowing up her house. *Id.* Yet, "each time they have been reported, [Plaintiff] and others were told it does not violate community standards." *Id.*

Plaintiff also alleges that Defendants allowed Thornsbery and his friends to post Lloyd's personal information, such as her address, her photos, and photos of her property, among other things, so that others know where she lives and can harass her. *Id.* Her harassers allegedly "even post that they will sit in front of Lloyds house to harass Lloyd." *Id.* In addition, Plaintiff alleges that Defendants allow the harassers to "brag on Facebook that they pissed on Lloyd[']s fence, damaged Lloyds fence, blow cigarette smoke at Lloyd while she is on oxygen, post pictures of Lloyds cameras and state how the[y] can get around Lloyds security systems and how they can use signal jammers to block Lloyds cameras which they did, forcing Lloyd to reinstall wired cameras." *Id.* Because many of the harassers are members of the Hells Angels, Plaintiff alleges that Defendants "allow[] the Hells Angels to have pages on their site where the[y] can organize and have gatherings" and threaten to have "the Hells Angels murder Lloyd." *Id.*

"Thornsbery. . . admits to hacking into Lloyds Facebook page and found out where Lloyd is residing in the state of Pennsylvania where he admits to still having well over 500 of his friends organized through Facebook to harass Lloyd." *Id.* Because of this harassment, Lloyd fled to Ohio for her safety. *Id.* ¶ 24.

B.     Procedural Background

Plaintiff filed her original complaint on December 29, 2021, and a more detailed FAC on May 31, 2022. *See* Docket No. 1; FAC. On May 28, 2022, Plaintiff served discovery requests on Defendants, and Defendants' counsel informed Plaintiff that her discovery requests were considered untimely because the parties had not yet held a Rule 26(f) conference. Heath Decl., ¶ Ex. B.

Defendants moved to dismiss Plaintiff's FAC and requested judicial notice of its Terms of Service and Data Policy. Docket No. 18 (Mot.); Docket No. 19. However, Plaintiff did not file an

1  opposition to Defendants' motions, which were due to be filed by June 28, 2022, pursuant to Local
2  Rule 7-3.  Instead, Plaintiff filed a motion to strike Defendants' motion to dismiss.  *See* Docket No.
3  23 (Motion to Strike).  Plaintiff also filed a motion to compel a Rule 26(f) conference and a
4  motion for administrative relief for sanctions against Defendants.  *See* Docket Nos. 21, 29.

### III.     LEGAL STANDARD

A.   Judicial Notice and Incorporation by Reference

On a motion to dismiss, a court "must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

Under Federal Rule of Evidence 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  Courts may take judicial notice on "undisputed matters of public record," but generally may not take judicial notice of "disputed facts stated in public records." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).  Facts subject to judicial notice may be considered on a motion to dismiss. *Mullis v. U.S. Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir. 1987).  "Proper subjects of judicial notice when a ruling on a motion to dismiss include . . . publicly accessible websites[.]" *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014) (citing *Caldwell v. Caldwell*, No. 05-4166, 2006 WL 618511, at *4 (N.D. Cal. Mar. 13, 2006); *Wible v. Aetna Life Ins. Co.*, 375 F.Supp.2d 956, 965-66 (C.D. Cal. 2005).

The doctrine of incorporation by reference is distinct, but related, to the doctrine of judicial notice.  Under the doctrine of incorporation by reference, the Court may consider documents "whose contents are alleged in complaint and whose authenticity no party questions. But which are not physically attached to the. . . pleadings." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  The court may incorporate such a document "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  The Ninth Circuit in *Knievel* extended this doctrine to apply where

4

the plaintiff's claim depends on the contents of the document and the parties do not dispute the authenticity of the document. *Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) (allowing the introduction of a website's contents that were seen alongside the disputed contents in a defamation suit that were not disputed for authenticity).

Therefore, the requirements for the documents that are relied on by the complaint to be incorporated are that: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (internal citations omitted). Such documents may be considered as "part of the complaint," without converting a Rule 12(b)(6) motion into a motion for summary judgment. *Ritchie*, 342 F.3d at 908. The contents of such documents may be assumed to be true for purposes of deciding as Rule 12(b)(6) motion. *Id.*

B.  <u>Failure to State a Claim (Rule 12(b)(6))</u>

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

C. Discussion

    1. Motion to Compel and Administrative Motion for Sanctions

Plaintiff moves to compel a Rule 26(f) conference. Under the Federal Rules, parties are not obligated to hold a Rule 26(f) conference until "21 days before a scheduling conference is to be held or a scheduling order is due." Fed. R. Civ. Proc. 26(f)(1). This Court has not yet held or scheduled a case management conference. Therefore, the parties are not yet obligated to hold such a conference under the Federal Rules.

Plaintiff also seeks to impose sanctions for Defendants' alleged failure to hold the Rule 26(f) conference and failure to hold a settlement meeting[2] within 60 days of the complaint. As noted above, Defendants did not fail to hold a Rule 26(f) conference. Regarding the settlement meeting, the Court issued an initial case management scheduling order on December 29, 2021, detailing that a joint inspection was to be held 60 days after the service of the complaint, and a settlement meeting was to be held within 35 days after the joint site inspection. *See* Docket No. 4. The case docket did not reflect any such activity for more than three months since the Complaint was filed. However, although the parties failed to hold a settlement meeting, the Court notes that the scheduling order did not account for the fact that a joint inspection was not needed. General Order 56 provides that "[i]f the parties agree that plaintiff alleges only violations unrelated to a physical location (such as programmatic or policy violations) . . . the parties may proceed directly to the required settlement meeting described in Paragraph 8 of this Order, in which case the settlement meeting shall be scheduled within 60 days after service of the Complaint." General Order 56 ¶ 7. Regardless, General Order 56 no longer applies because Plaintiff's ADA claims are

---

[2] Although Plaintiff cites *Johnson v. 480 Geary St., LLC*, this case is inapposite. In *Johnson*, the defendants were sanctioned after failing to file their initial disclosures, opposition to Plaintiff's motion for administrative relief based on this failure, response to the court's order to show cause, and requiring court intervention to schedule a joint site inspection. No. 19-CV-02460-JSW, 2020 WL 12654453, at *1-2 (N.D. Cal. May 28, 2020). The court had warned that "given their record of failing to comply with deadlines, . . . if [the d]efendants did not serve their initial disclosures by [the ordered date], they would be ordered to show cause why the [c]ourt should not impose any or all sanctions[.]" *Id.*

1  dismissed, as discussed below.

2      Accordingly, the Court **DENIES** Plaintiff's Motion to Compel and Motion for
3  Administrative Relief.

4      2.        <u>Judicial Notice</u>

5      Defendants seek to incorporate by reference two exhibits: (1) Meta's Terms of Service and
6  (2) Meta's Data Policy as of May 31, 2022. *See* Docket No. 19. Both exhibits may be
7  incorporated by reference because they are referenced extensively in the complaint and are
8  integral to Plaintiff's claims. *Ritchie*, 342 F.3d at 908 ("Even if a document is not attached to a
9  complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively
10 to the document or the document forms the basis of the plaintiff's claim.").

11     In her complaint, Plaintiff alleges a breach of contract claim premised on Meta's Terms of
12 Service (formerly known as Facebook's Statement of Rights and Responsibilities). *See* FAC ¶¶
13 22 ("Facebook Statement of Rights and Responsibilities, states that Facebook enables people to
14 connect with each other, build communities and grow businesses. In order to use Facebook. . .
15 you must not violate the Community Standards."), 38. Although Plaintiff does not reference the
16 Data Policy directly, the Terms of Service incorporate the Data Policy, and it is relevant to
17 Plaintiff's claims on Meta's alleged tracking. Ex. A. ("To provide these services, we must collect
18 and use your personal data. We detail our practices in the Data Policy, which you must agree to in
19 order to use our products"); *see also In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
20 402 F. Supp. 3d 767, 792 (N.D. Cal. 2019) (holding that Facebook's Terms of Service
21 "incorporate the Data Use Policy into the contractual agreement between Facebook and its
22 users."). Meta's Terms of Service, which the FAC makes extensive reference to, and the Data
23 Policy, form the basis of Plaintiff's claims and should therefore be "considered part of the
24 pleading." *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1037 n.1 (N.D. Cal. 2019) (granting
25 Facebook's request to incorporate by reference the Terms of Service because the consolidated
26 complaint relied upon them to allege the breach of contract claims and statutory claims).
27 Therefore, because Plaintiff indicates that the alleged conduct occurred up until she filed her FAC,
28 it is appropriate for the Court to take judicial notice of the Terms of Service effective when she

1    filed her FAC in May 2022.  *See* FAC ¶ 22.

2    In addition, "[b]ecause [the Terms of Service and Data Policy] are publicly accessible

3    webpages and Defendant[s] do[] not oppose authentication of the websites[,]" these exhibits are

4    properly subject to judicial notice. *Lindora, LLC v. Limitless Longevity LLC,* No. 15-CV-2847-

5    JAH (KSC), 2016 WL 6804443, at *3 (S.D. Cal. Sept. 29, 2016); *see also Opperman v. Path, Inc.*,

6    205 F. Supp. 3d 1064, 1068-69 n.3 (N.D. Cal. 2016) (taking judicial notice of Yelp's privacy

7    policies); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 983-84 (N.D. Cal. 2010)

8    (taking judicial notice of Xbox software license and terms of service).

9    Accordingly, the Court **GRANTS** Defendants' request for judicial notice and incorporates

10   by reference Meta's Terms of Service and Data Policy.

   3.    Motion to Strike

12   Rather than opposing the Defendants' motion to dismiss, Plaintiff asks the Court to strike

13   Defendants' motion, or alternatively, to convert it into a motion for summary judgment.  Plaintiff

14   argues that Defendants inappropriately rely on extrinsic evidence.  *See* Motion to Strike at 1.  The

15   extrinsic evidence Plaintiff refers to are Meta's Terms of Service and Data Policy, which are

16   proper subjects of incorporation by reference and judicial, as discussed above.  *See, e.g., Kidstar v.*

17   *Facebook, Inc.*, 2021 WL 1110227 *2 (N.D. Cal. March 23, 2021) (granting motion to dismiss

18   and noting that while a court may generally not consider material outside the pleadings,

19   documents subject to judicial notice can be considered without converting a motion to dismiss to

20   one for summary judgment).  Accordingly, the Court **DENIES** Defendants' Motion to Strike.

   4.    Claims Against Mark Zuckerberg

22   The FAC offers no plausible claims directly against Mr. Zuckerberg.  The FAC only states

23   in a conclusory manner that because Mr. Zuckerberg he should be held liable because he is the

24   CEO of the company and was "personally involved and/or directed the challenged acts" that

25   Plaintiff alleges.  FAC ¶ 10.  However, this bare assertion without any factual allegations is

26   insufficient to survive the motion to dismiss stage.  *See Twombly*, 550 U.S. at 570; *see Brock v.*

27   *Zuckerberg*, 2021 WL 2650070, at *4 (S.D.N.Y. June 25, 2021) (dismissing claims against Mr.

28   Zuckerberg when the plaintiff failed to allege any facts "connecting Zuckerberg. . . to [their]

1    claims").

2    Plaintiff seeks to hold Mr. Zuckerberg under an alter ego theory. *See Sonora Diamond*

3  *Corp. v. Super. Ct*., 83 Cal. App. 4th 523, 538 (2000). The alter ego theory is an "extreme

4  remedy" that is "sparingly used." *Id.* at 539-41. For the theory to apply, California law requires:

> First, that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness of the said person and corporation has ceased; [and] second, that the factors are such that an adherence to the fiction of the separate existence of the corporation, would under the particular circumstances, sanction a fraud or promote injustice.

*Wood v. Ellig Corp*., 20 Cal.3d 353, 142 Cal.Rptr. 696, 572 P.2d 755 (1977); *Firstmark Capital Corp. v. Hempel Financial Corp*., 859 F.2d 92, 94 (9th Cir. 1988) (citing same). Main factors to be considered in determining whether the alter ego doctrine applies include "the commingling of funds and other assets, the individual holding himself out as liable for the debts of the corporation, ownership and control of the corporation by the individual, inadequate capitalization, disregard of corporate formalities, and lack of segregation of corporate records." *Sonora*, 83 Cal. App. 4th at 539-41 (citations omitted).

There is no plausible claim under the alter-ego theory of responsibility. Plaintiff again merely argues that "Zuckerberg should be held liable under alter ego as CEO of the company and he was personally involved and/or directed the challenged acts Lloyd states" and "Zuckerberg is the alter ego as CEO of Facebook so he is personally liable for orchestrating this attack towards Lloyd on Facebook." FAC ¶¶ 13,39. There are no facts whatsoever in the Complaint that would allow this Court to consider Zuckerberg under an alter ego theory. Without any factual allegations, the Court cannot consider any of the factors listed above.

As such, the Court **GRANTS** Defendants' motion for any claims against Zuckerberg.

5.   Violation of the ADA

To prevail on a claim under Title III of the ADA, the plaintiff must show that: "(1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her disability." *Ariz ex. Rel. Goddard v. Harkins*

*Amusement Enters.*, 603 F.3d 666, 670 (9th Cir. 2010).

Plaintiff's claim fails under the second prong because the Facebook platform is not a place of public accommodation. In the Ninth Circuit, "places of public accommodation" are limited to "actual physical spaces." *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1115 (N.D. Cal. 2011) (*citing Weyer v. Twentieth Century Fox Film*, 198 F.3d 1104, 1114 (9th Cir. 2000). The only exceptions are rare circumstances where there is some connection or nexus "between the good or service complained of and an actual physical place." *Weyer*, 198 F.3d at 1114. This nexus requirement is only met where a website's "inaccessibility impedes [the plaintiff's] access to the serves of the defendant's physical office." *Gomez v. Gates Ests.*, Inc., No. C-21-7147 WHA, 2022 WL 458465, at *4 (N.D. Cal. Feb. 15, 2022); *see, e.g.*, *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019) (finding a nexus between Domino's website and the physical pizza franchises because customers use the website to find nearby restaurants and order pizzas).

The Facebook platform is an online social media website where people can create accounts and connect with others across the world. *See* FAC ¶ 6. There is no physical space that the Defendants operate that would warrant considering a nexus with the Facebook platform, and the FAC contains no allegations that relate to impeded access to goods and services from a physical location. *See Young*, 790. F. Supp. 2d. at 1116 (dismissing an ADA claim because "Facebook's internet services [] do not have a nexus to a physical place of public accommodation for which Facebook may be liable under the statute"). Accordingly, Plaintiff has failed to state a claim for violation of the ADA, and the Court **GRANTS** Defendants' motion for the ADA claim.

6. <u>Violation of Section 508 of the Rehabilitation Act</u>

The Rehabilitation Act of 1973 prohibits discrimination based on a disability in programs conducted by federal departments, federal agencies, in programs receiving federal financial assistance, and in federal employment. *See* 29 U.S.C. § 794(d). Specifically, Section 508(a), titled "Requirements for Federal departments and agencies," provides that "each Federal department or agency . . . shall ensure . . . individuals with disabilities who are members of the public seeking information or services from a Federal department or agency to have access to and use of information . . ." 29 U.S.C. § 794d(a)(1)(A). "Section 508 . . . imposes requirements on

federal departments and agencies to ensure that all electronic and information technology is accessible to individuals with disabilities" unlike other sections that "generally applies to entities, including state and local governments, that receive federal funds and [are] not focused on electronic information and technology." *Meyer v. Walthall*, 528 F. Supp. 3d 928, 943 (S.D. Ind. 2021); 29 U.S.C. § 794d(a).

Here, Plaintiff's Rehabilitation Act claim fails because Meta and Facebook are private entities, and Zuckerberg is an individual. Therefore, the Court **GRANTS** Defendants' motion to dismiss the Rehabilitation Act claim.

7. Violations of the California Unruh Act

The California Unruh Civil Rights Act provides that "all persons within this jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, . . . disability. . . are entitled to full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). A violation of the Unruh Act can be maintained with an ADA claim, or if no such claim exists, when a plaintiff pleads "intentional discrimination in public accommodations in violation of the terms of the Act." *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 668, 94 Cal. Rptr.3d 685, 208 P.3d 623 (2009) (quoting *Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1175, 278 Cal.Rptr. 614, 805 P.2d 873 (1991)). To succeed on an Unruh Act claim, a plaintiff must allege facts that demonstrate "willful, affirmative misconduct" and provide more than "the disparate impact of a facially neutral policy on a particular group." *Cullen v. Netflix*, 880 F. Supp. 2d 1017, 1024 (N.D. Cal. 2012) (finding that the allegations that Netflix did not caption its streaming library were insufficient to support an Unruh Act claim without more facts establishing intentional discrimination).

Here, the Unruh Act claim cannot be maintained with an ADA claim because Plaintiff's ADA claim fails, as discussed above. The claim also cannot be maintained independently because Plaintiff fails to allege any specific facts showing intentional discrimination. Plaintiff here has stated only in a conclusory manner that "Defendants acted with discriminatory intent" and "treated Lloyd differently because of her disability." FAC ¶ 20. That is a bare assertion that simply recites the elements of the cause of action without any factual allegations to suggest intentional conduct.

*See Levitt,* 765 F.3d at 1135; *Young*, 790 F. Supp. 2d at 1116 (finding that plaintiff could not allege specific facts that demonstrated that Facebook intended to treat her differently because of her disability or show that Facebook intentionally applies its policies in a way that targets people with disabilities).

Accordingly, the Court **GRANTS** Defendants' motion to dismiss the Unruh Act claim.

8. Fraud and Intentional Misrepresentation

Under California law, the elements of a fraud claim include false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages. *Lazar v. Superior Ct.*,12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981 (1996); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). Fraud is also subject to the heightened pleading standard of Rule 9(b). *See* F.R.C.P. 9(b). Specifically, the "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess*, 317 F.3d at 1106 (citation omitted). "Intent to defraud is defined as the intent to induce reliance on a knowing misrepresentation or omission." *Moss v. Kroner*, 197 Cal.App.4th 860, 129 Cal.Rptr.3d 220, 226 (2011). "[M]ere conclusory allegations" that representations or omissions "were intentional and for the purpose of defrauding and deceiving plaintiffs ... are insufficient." *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal.App.4th 115, 61 Cal.Rptr.3d 221, 234 (2007).

Plaintiff here has asserted claims for both fraud and intentional misrepresentation, which is a claim for fraud; therefore, the Court "consider[s] the two causes of action as one." *See Lintz v. Bank of America, N.A.*, No.:5-13-CV-01757-EJD, 2013 WL 5423873, at *5 (N.D. Cal. Sept. 27, 2013). The FAC alleges that Defendants made fraudulent statements in its "Statement of Rights and Responsibilities" (i.e., Terms of Service) that it had not lived up to, such as stating that "they are committed to making [F]acebook a safe place" and that "Facebook. . . states they are committed to protecting privacy and information." FAC ¶ 22. However, the Complaint fails to allege any facts supporting a reasonable inference that Facebook intended to defraud Plaintiff. Plaintiff merely alleges that "[a]ll of the above is fraudulent and intentional misrepresentation by the Defendants" which "Defendants intended Lloyd to rely on[.]" *Id.* ¶¶ 23-24. However, Plaintiff's entirely conclusory statement that Defendants intended Plaintiff to rely on the alleged

12

representations is insufficient to state a claim for fraud. *See Linear Technology Corp.*, 61 Cal. Rptr. 3d at 234. Accordingly, the Court **GRANTS** Defendants' motion to dismiss the fraud claims.

9. <u>Section 230 of the Communications Decency Act</u>

Plaintiff's claims for negligence, negligent infliction of emotional distress, and invasion of privacy are related to third-party users' posting of Plaintiff's private information "such as her address[,] her medical conditions and her picture" on Facebook. FAC ¶ 29. Plaintiff alleges that Defendants allowed Facebook users to threaten to murder and rape Plaintiff through Facebook. *Id.* ¶ 40.

Section 230 bars claims based on a service provider's decisions about "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099 (9th Cir. 2009) (holding that Section 230 bars any "activity that can be boiled down to deciding whether to exclude material that third parties seek to post online"). Under the statute, a claim should be dismissed if: (1) the defendant is a "provider. . . of an interactive computer service[;]" (2) the allegedly offending content was "provided by another information content provider[;]" and (3) Plaintiff's claims treat the defendant as the "publisher" of that content. 47 U.S.C. § 230(c)(1).

The first prong is met because Meta and/or Facebook is an interactive computer service provider. Section 230 defines an interactive computer service provider as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer service." 47 U.S.C. § 230(f)(2). Courts have consistently held that Meta or Facebook meets Section 230's "interactive computer service" definition. *See, e.g., Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 206 (2017); *Calise v. Meta Platforms*, Inc., No 21-cv-06186-JSW, 2022 WL 1240860, *2 (N.D. Cal. April 27, 2022). The second prong is met because the alleged threats were content created by a user of Facebook, not Defendants. *See* 47 U.S.C. § 230(c)(1); *Igbonwa v. Facebook, Inc.*, No-18-cv-02027-JCS, 2018 WL 4907632 (N.D. Cal. Oct. 9, 2019) (holding that a user's offensive content was not created by Facebook but another content provider). Finally, the third prong is met because Plaintiff seeks to treat Defendants as a

13

"publisher." Under Section 230, a plaintiff's claim treats a service provider as a "publisher" when the claim seeks to hold it liable for its exercise of "editorial functions" – including "deciding whether to publish, withdraw, postpone, or alter content." *Barnes*, 570 F. 3d at 1102. Here, Plaintiff alleges that the Defendants failed to take appropriate moderation measures against users. This is exactly the type of claim that courts consistently deem protected publisher activity. *See, e.g., Igbonwa*, 2018 WL 4907632 at *6 (dismissing claim based on the theory that Facebook wrongfully allowed and then failed to remove the content from third parties).

Accordingly, Plaintiff's claims for negligence and negligent infliction of emotional distress are barred as a matter of law under Section 230(c)(1) of the Communications Decency Act, 47 U.S.C. § 230, and the Court **GRANTS** Defendants' motion to dismiss the negligence and negligent infliction of emotional distress claims in full, and the invasion of privacy claim to the extent that it treats them as a publisher of third-party content.

10. Breach of Contract

Although CDA Section 230(c)(1) equally applies to a breach of contract claim, a contract theory of liability is not necessarily barred by CDA if the alleged contract or promise relates to an interactive computer service's action as a publisher. *See Barnes*, 570 F. 3d at 1102. For example, in *Barnes*, the plaintiff requested that her profiles containing nude photos posted by her former boyfriend be removed multiple times. Eventually, Yahoo's director told her that they would take care of it but took no further action for months. *Id.* at 1098-99. The Ninth Circuit construed the plaintiff's allegations regarding Yahoo's promise to remove the indecent profiles and her reliance thereon to her detriment under promissory estoppel. *Id.* at 1107. The Ninth Circuit explained that liability for promissory estoppel is not necessarily for behavior that is identical to publishing or speaking. *Id.* (**"**Promising is different because it is not synonymous with the performance of the action promised. That is, whereas one cannot undertake to do something without simultaneously doing it, one can, and often does, promise to do something without actually doing it at the same time."). Therefore, "[c]ontract liability . . . would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication." *Id.*

14

However, the Ninth Circuit further explained that "[a]s a matter of contract law, the promise must "be as clear and well defined as a promise that could serve as an offer, or that otherwise might be sufficient to give rise to a traditional contract supported by consideration." *Id.* at 1108 (citations omitted). "Thus[,] a general monitoring policy, or even an attempt to help a particular person, on the part of an interactive computer service such as Yahoo does not suffice for contract liability." *Id.* However, "[i]nsofar as Yahoo made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline." *Id.* at 1108-09.

Likewise, in *Morton v. Twitter, Inc.*, the plaintiff alleged that Twitter failed to enforce its non-consensual nudity policy, in which it promised that it "will immediately and permanently suspend any account that [it] identif[ies] as the original poster of intimate media that was created or shared without consent." No. CV 20-10434-GW-JEMX, 2021 WL 1181753, at *5 (C.D. Cal. Feb. 19, 2021). Although Twitter removed the plaintiff's nude photographs, it failed to delete all related posts or suspend the accounts until her complaint was filed. *Id.* at *1. The court recognized that "a breach of contract claim based on promissory estoppel for a website's failure to remove content it promised to remove is not necessarily barred by Section 230"; however, it dismissed the promissory estoppel claim because the plaintiff failed to point to any contractual provisions and clearly plead promissory estoppel. *Id.* at *5-6 ("[T]here is nothing to indicate that [the policy] is binding, as opposed to merely aspirational statements . . . The Complaint . . . does not clearly plead promissory estoppel.").

A California appellate court similarly involved a woman who sued Twitter when she was locked out of her account, and her tweets were removed from the platform. *See Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 28, 274 Cal. Rptr. 3d 360, 371 (2021). However, the court noted that she "d[id] not allege that someone at Twitter specifically promised her they would not remove her tweets or would not suspend her account." *Id*. at 372-73. The court concluded that she "d[id] not identify any specific representation of fact or promise by Twitter to Murphy . . . beyond general statements in its monitoring policy, the type of allegation the *Barnes* court noted would be insufficient to state a claim." *Id.* at 32, 274 Cal. Rptr. 3d at 374-75 (citing *Barnes,* 570 F.3d at 1108).

15

Here, Plaintiff's breach of contract claims originate from the Facebook Statement of Rights and Responsibilities, which is now known as Meta's Terms of Service. The claim seeks to hold Defendants liable for the conduct of third-party users on the Facebook platform by alleging that Defendants did not take action after being made aware of harmful actions by third parties against the Plaintiff. FAC ¶ 39 ("Even after being made aware of Violations by other third parties, Defendants refuse to take action for the past five years."). She notes that Defendants have user requirements in their Statement of Rights and Responsibilities, including that "you may not violate the Community Standards," as well as Defendants' alleged commitments, including that "they are committed to protecting privacy and information." *Id.* ¶ 38.

Facebook's Terms of Service state:

> We employ dedicated teams around the world and develop advanced technical systems to detect misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community. If we learn of content or conduct like this, we will take appropriate action - for example, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement.

Docket No. 19-2 (Terms of Service).

Facebook's Community Standards state that they are committed to making Facebook a safe and authentic place and protecting privacy. However, merely stating that Facebook does not allow users to post harmful content and that they will remove them is mere "a general monitoring policy" that the Ninth Circuit noted was insufficient. *See Barnes*, 570 F. 3d at 1108; *Morton*, 2021 WL 1181753, at *5.

Although Plaintiff alleges that the alleged posts "has been reported hundreds of times over the past 5 years[,]" she has also not alleged "any specific representation of fact or promise by [Defendants] . . . beyond general statements in its monitoring policy, the type of allegation the *Barnes* court noted would be insufficient to state a claim." FAC ¶ 26; *Murphy*, 60 Cal. App. 5th at 32, 274 Cal. Rptr. 3d at 374-75 (citing *Barnes,* 570 F.3d at 1108). Plaintiff does not allege that Facebook has acknowledged its awareness of the violations and promised that the violations would be taken care of like *Barnes*. There are no other facts that would indicate that Facebook "made a promise with the constructive intent that it be enforceable." *Barnes*, 570 F. 3d at 1109.

1 As such, Plaintiff's breach of contract claim fails, and the Court **GRANTS** Defendants' motion to
2 dismiss the contract claim.

### 11. Privacy Claims Related to Meta's Targeted Advertising

Plaintiff also alleges that Facebook "track[s] Lloyd when she is not logged into facebook and is using other third party sites such as Chewy.com, Target. Com, etc." because "ads from these other third party sites immediately show up on Lloyds facebook account." FAC ¶¶ 30-31. According to Plaintiff, she "never gave Facebook any permission to track her while she is on her computer or any other electronic device and not logged into Facebook" and that "Facebook has no authority to track Lloyd on her computer or electronic devices when she is not logged into Facebook." *Id.* ¶¶ 28-29.

To state a claim for intrusion upon seclusion under California common law, a plaintiff must plead that (1) a defendant "intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy[,]" and (2) the intrusion "occur[red] in a manner highly offensive to a reasonable person." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286, 97 Cal.Rptr.3d 274, 211 P.3d 1063 (2009). "A claim for invasion of privacy under the California Constitution involves similar elements." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020), *cert. denied sub nom. Facebook, Inc. v. Davis*, 141 S. Ct. 1684, 209 L. Ed. 2d 464 (2021). Plaintiffs must show that (1) they possess a legally protected privacy interest, (2) they maintain a reasonable expectation of privacy, and (3) the intrusion is "so serious ... as to constitute an egregious breach of the social norms" such that the breach is "highly offensive." *Hillsides, Inc.*, at 287, 97 Cal.Rptr.3d 274, 211 P.3d 1063. "Because of the similarity of the tests, courts consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *In re Facebook*, 956 F.3d at 601.

The Ninth Circuit recently considered claims for relief for intrusion upon seclusion under California common law and invasion of privacy under the California Constitution when the plaintiffs alleged that Facebook continued to track their browsing histories after they had logged out of Facebook. *See In re Facebook*, 956 F.3d at 596, 601. The Ninth Circuit found that the

17

plaintiffs sufficiently pleaded the "reasonable expectation of privacy" element, reasoning that "Facebook's privacy disclosures at the time allegedly failed to acknowledge its tracking of logged-out users, suggesting that users' information would not be tracked." *Id.* The Data Use Policy at the time stated: "We receive data whenever you visit a game, application, or website that uses [Facebook's services]." *Id.* at 602. The Help Center page stated: "If you are logged into Facebook, we also see your user ID number and email address. . . . If you log out of Facebook, we will not receive this information about partner websites but you will also not see personalized experiences on these sites." *Id.* Therefore, the Ninth Circuit found that:

> upon reading Facebook's statements in the applicable Data Use Policy, a user might assume that only logged-in user data would be collected. Plaintiffs have alleged that the applicable Help Center page affirmatively stated that logged-out user data would not be collected. Thus, Plaintiffs have plausibly alleged that Facebook set an expectation that logged-out user data would not be collected, but then collected it anyway.

*Id.*

However, Facebook's current Data Policy states:

> Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Facebook pixel. **These partners provide information about your activities off Facebook**—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services —**whether or not you have a Facebook account or are logged into Facebook**. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information. Partners receive your data when you visit or use their services or through third parties they work with. We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us.

Docket No. 19-3 (Data Policy) (emphasis added). Facebook's current Data Policy clearly states that third-party data will be shared even if a user is logged off. As such, there was no reasonable expectation of privacy, unlike *In re Facebook*. Accordingly, the Court **GRANTS** Defendants' motion to dismiss the privacy claims relating to the tracking of Lloyd's data.

18

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss with leave to amend the breach of contract claim within thirty (30) days of the date of this order. The Court also notes that Plaintiff filed a motion to file a second amended complaint prior to the Court's ruling on the FAC. Because the Court grants leave to amend, Plaintiff's motion is moot. Plaintiff should file a new third amended complaint if she decides to amend her claim. The Court also notes that even if Plaintiff can sufficiently plead a breach of contract claim, the Court may not retain diversity jurisdiction for not meeting the requisite $75,000 due to Facebook's limitation of liability provision within its Terms of Service.

This order disposes of Docket Nos. 18, 21, 23, 29, and 30.

**IT IS SO ORDERED**.

Dated: October 3, 2022

_____
EDWARD M. CHEN
United States District Judge